IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| AMLIN CORPORATE MEMBER LTD., THE UNDERWRITING MEMBER OF LLOYD'S SYNDICATE 2001 | * | |
| | * | |
| | * | |
| Plaintiff, | * | |
| v. | * | Civil Action No.  RDB-13-3054 |
| MEDICAL BENEFITS ADMINISTRATORS OF MARYLAND, INC. et al., | * | |
| | * | |
| Defendants | * | |

\*      \*      \*      \*      \*      \*      \*      \*      \*      \*      \*      \*      \*

## MEMORANDUM OPINION

This case arises out of the ultimately unsuccessful efforts by various parties to prevent the failure of several employee benefit trusts.  Plaintiff Amlin Corporate Member Ltd., the underwriting member of Lloyd's Syndicate 2001, ("Amlin") was the lead underwriter on insurance certificates issued by Defendant R.J. Wilson & Associates to eight trusts,[1] which Amlin has also named as Defendants.  These trusts are employee benefit plans

---

[1] The trusts named as Defendants include:
1) Brandsource Benefit Trust ("Brandsource")
2) CALPASC Group Benefit Trust ("CALPASC")
3) Custom Rail Employer Benefit Trust ("CREW")
4) IDA Group Benefit Trust ("IDA")
5) IEC Group Benefit Trust ("IEC")
6) Midas Dealers Employees Benefit Trust ("Midas")
7) N3A Group Benefit Trust ("N3A")
8) Premier Club Benefit Trust ("PCB")

The Court has already entered a default judgment as to IEC Group Benefit Trust.  In addition, the Clerk of Court has entered a default as to Brandsource, CALPASC, IDA, Midas, and N3A, and there are currently pending motions for default judgment as to these defendants.

operating under the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001, *et seq.* Amlin extended interest free loans to four of these trusts that were experiencing financial difficulties. The trusts, however, never recovered, ultimately stopped repaying the loans, and had their insurance terminated by Amlin. Subsequently, the trusts recovered a settlement from their prior insurers, and Amlin initiated this lawsuit in order to obtain repayment of its loans to the trusts from the settlement funds.

Currently pending before the Court are several cross-motions for summary judgment.[2] Specifically, Plaintiff Amlin Corporate Member, Ltd. has filed a Motion for Partial Summary Judgment (ECF No. 92), while Defendants Medical Benefits Administrators of Maryland, Inc. and R.J. Wilson & Associates have each filed cross-motions for summary judgment (ECF Nos. 105 & 108) as well. The parties' submissions have been reviewed and this Court held a hearing on July 29, 2015. For the reasons that follow, Plaintiff Amlin Corporate Member, Ltd.'s Motion for Partial Summary Judgment (ECF No. 92) and Defendant Medical Benefits Administrators' Motion for Summary Judgment (ECF No. 105) are DENIED. However, R.J. Wilson & Associates' Motion for Summary Judgment (ECF No. 108) is GRANTED, and Judgment shall be entered in its favor.

---

[2] As noted above, Amlin has also filed motions for default judgment as to five of the defendant trusts. *See* ECF Nos. 161-65. As noted in this Court's previous order, this Court will continue to hold those motions under advisement. *See* July 29, 2015 Order, ECF No. 167.

BACKGROUND

In ruling on a motion for summary judgment, this Court reviews the facts and all reasonable inferences in the light most favorable to the nonmoving party.  *Scott v. Harris*, 550 U.S. 372, 378 (2007); *see also Hardwick ex rel. Hardwick v. Heyward*, 711 F.3d 426, 433 (4th Cir. 2013).

Plaintiff Amlin Corporate Member Ltd., the underwriting member of Lloyd's Syndicate 2001, ("Amlin") was the lead underwriter on insurance certificates issued by Defendant R.J. Wilson & Associates (Amlin's coverholder[3]) to the Defendant Trusts within the time periods 2007-2008, 2008-2009 and 2009-2010.  Amlin Corporate Member Ltd. was the sole underwriting member of Syndicate 2001 in the years in question.

Defendant Medical Benefits Administrators of MD, Inc. ("MBA") was the Plan Administrator of the CREW Trust.[4]  Dayspring Management LLC ("Dayspring") was the Plan Administrator of the Brandsource, CALPASC, IDA, IEC, Midas, N3A, and PCB Trusts.  MBA was also the claims administrator for the Defendant Trusts; in that role, its duties included preparing accountings, adjudicating and processing claims, billing employers, and collecting proceeds.

---

[3] A coverholder is a company or partnership authorized by a managing agent to enter into a contract or contracts of insurance to be underwritten by an insurer.  Coverholders allow insurers to operate in a region or country as if they were a local insurer.

[4] A plan administrator is responsible for the day-to-day operations of a trust and ensures the plan operates as required under the trust agreement and applicable laws.

All Defendant Trusts are ERISA benefit plans domiciled in Washington, D.C. and have their principal place of business in Maryland.  The names of the various Defendant Trusts are:

1) Brandsource Benefit Trust ("Brandsource")
2) CALPASC Group Benefit Trust ("CALPASC")
3) Custom Rail Employer Benefit Trust ("CREW")
4) IDA Group Benefit Trust ("IDA")
5) IEC Group Benefit Trust ("IEC")
6) Midas Dealers Employees Benefit Trust ("Midas")
7) N3A Group Benefit Trust ("N3A")
8) Premier Club Benefit Trust ("PCB")

The Defendant Trusts are no longer fully operational and are winding down existing claims and obligations to the extent that they are operational at all.

_The Loans_

In 2008 and 2009, Amlin (along with other underwriters) provided interest-free loans to PCB, CREW, IEC, and CALPASC under Special Accommodation Amendments (the "Accommodation Amendments") to provide protection to these Trusts due to non-payment of claims by the prior insurer.[5]  In essence, these agreements served to amend the original Certificates of Insurance issued by Amlin. These Agreements allowed for Amlin to immediately reimburse each of these Trusts for the full amount of a specific list of eligible outstanding covered healthcare expenses that were determined to be payable.  PCB, CREW, IEC, and CALPASC each agreed to repay Amlin over either an 18-month or a 24-month period.  Only partial payments were made, and the Trusts eventually ceased making

---

[5] The loans allowed the Trusts to pay outstanding medical claims and avoid termination of the Trusts by federal regulators.  Had the Trusts been terminated, Amlin's terminal liability would have been triggered pursuant to the insurance certificates issued by Amlin to the Trusts.

payments.[6] Amlin therefore alleges that large sums are still due.  The following table reflects the amounts in question:

|  | Loan Amount | Payments | Amount Still Due |
|---|---|---|---|
| **PCB** | $1,504,454 | $336,290 | $1,168,164 |
| **CREW** | $201,075 | $83,781 | $117,294 |
| **IEC** | $965,398 | $243,243 | $722,155 |
| **CALPASC** | $129,441 | $0 | $129,441 |
| *Totals* | *$2,800,368* | *$663,314* | *$2,137,054* |

The Special Accommodation Amendments included the following provision regarding liability for the advances upon termination of the Trusts' insurance:

> In the event of termination or non-renewal of this insurance, the Assured [the trust] shall continue to repay Underwriters from the positive net fund balance of the Trust if any, the remainder of any outstanding installments due under this Amendment. Otherwise, this obligation shall be considered part of the terminal liability of the Plan and shall be subject to the terms of such termination or non-renewal as set forth in the Certificates of Insurance.

PCB SAA, ECF No. 1-11; CREW SAA, ECF No. 1-12.[7]

*The Illinois Litigation*

In June 2009, the Defendant Trusts (and other trusts that were not insured by Amlin) initiated litigation against their prior insurers in a case that was ultimately removed to the

---

[6] Specifically, it appears that MBA made payments on behalf of the Trusts until Amlin terminated the Certificates of Insurance.

[7] The original Certificates of Insurance included the following limitation of liability based upon termination of the insurance program: "In the event of the termination or non-renewal of the Program, Underwriters shall be liable for any Claims Incurred during the Period of Insurance which exceed the Terminal Fund." CREW Certificate of Insurance at 4, ECF No. 1-5; PCB Certificate of Insurance at 4, ECF No. 1-10.

United States District Court for the Northern District of Illinois under the caption *Evangelical Benefit Trust et al v. Lloyd's Underwriter Syndicate Nos. 2987 et al.*, No. 09-CV-04004 (N.D. Ill.) (the "Lawsuit"). In the Lawsuit, the Trusts alleged that the prior insurers breached their contracts by failing to pay covered claims, which jeopardized the continued operation of the Trusts.

On or around July 8, 2013, the Trusts settled the Lawsuit with the prior insurers (the "Settlement"). Amlin first learned of this Settlement on or around July 24, 2013. The total settlement amount was $4 million, and the various plaintiff trusts recovered approximately $2.5 million of that amount.[8] The Settlement funds were allocated to the trusts on a *pro rata* basis based on their estimated damages caused by the prior insurer. The Defendant Trusts in this matter recovered the following amounts from the settlement funds:

|  | Amount of Settlement Funds Recovered |
|---|---|
| **PCB** | $304,502.93 |
| **CREW** | $238,349.69 |
| **IEC** | $259,512.87 |
| **CALPASC** | $226,929.25 |
| **Brandsource** | $19,711.43 |
| **IDA** | $72,160.45 |
| **N3A** | $115,924.45 |
| **Midas** | $18,284.02 |

---

[8] The other $1.5 million was allocated for the plaintiffs' attorneys fees.

Amlin inquired of MBA regarding the Settlement of the Lawsuit, but MBA would not provide any details about the Settlement itself or the intended allocation of payments from the Settlement proceeds.

Before this Court's entry of a temporary restraining order, almost $397,000 of the Settlement funds were distributed for non-medical claims.[9]

Proceedings in this Court

On October 21, 2013, this Court held a hearing on Amlin's Motion for a TRO. Ultimately, this Court granted a temporary restraining order against Medical Benefits Trust, Dayspring Management LLC, Premier Club Benefit Trust, Custom Rail Employer Benefit Trust, IEC Group Benefit Trust, and CALPASC Group Benefit Trust that prohibited them from distributing the Illinois settlement funds.  Thus, the Court focused solely on those Defendants that had received loans from Amlin.  In addition, the Court required an accounting from those Defendants and R.J. Wilson and Associates.

This Court held another hearing on November 4, 2013.  As a result of that hearing, this Court entered a preliminary injunction prohibiting the disbursement of settlement funds without the approval of the Court by Defendants Medical Benefits Administrators of Maryland, Inc., Premier Club Benefit Trust, Custom Rail Employer Benefit Trust, IEC

---

[9] These various payments are detailed on pages 12 and 13 of Amlin's Memorandum in Support of its Motion for Partial Summary Judgment (ECF No. 94).  These payments covered, *inter alia*, administrative and legal fees.

Group Benefit Trust and CALPASC Group Benefit Trust.[10]   The Court also ordered a monthly accounting.

At this time, the Illinois settlement funds allocated to PCB and CALPASC, which were distributed to MBA, are held in individual accounts for the Trusts.  The funds allocated to CREW and IEC remain in the client trust account of the law firm of Reed Smith LLP, which represented the trusts during the Illinois litigation.

## STANDARD OF REVIEW

Rule 56 of the Federal Rules of Civil Procedure provides that a court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  A material fact is one that "might affect the outcome of the suit under the governing law." *Libertarian Party of Va. v. Judd*, 718 F.3d 308, 313 (4th Cir. 2013) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).  A genuine issue over a material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248.  When considering a motion for summary judgment, a judge's function is limited to determining whether sufficient evidence exists on a claimed factual dispute to warrant submission of the matter to a jury for resolution at trial.  *Id.* at 249.

In undertaking this inquiry, this Court must consider the facts and all reasonable inferences in the light most favorable to the nonmoving party.  *Libertarian Party of Va.*, 718 F.3d at 312; *see also Scott v. Harris*, 550 U.S. 372, 378 (2007).  In so doing, this Court "must

---

[10] This Court did not find, however, that continuing injunctive relief was appropriate with respect to Dayspring Management LLC or R.J. Wilson & Associates.

not weigh evidence or make credibility determinations." *Foster v. University of Md.-Eastern Shore*, __ F.3d __, 2015 WL 2405266, *3 (4th Cir. May 21, 2015) (citing *Mercantile Peninsula Bank v. French*, 499 F.3d 345, 352 (4th Cir. 2007)).  As this Court has previously explained, a "party cannot create a genuine dispute of material fact through mere speculation or compilation of inferences." *Shin v. Shalala,* 166 F. Supp. 2d 373, 375 (D. Md. 2001) (citations omitted).

When both parties file motions for summary judgment, as here, the court applies the same standard of review to both motions, with this Court considering "each motion separately on its own merits to determine whether either [side] deserves judgment as a matter of law." *Rossignol v. Voorhaar*, 316 F.3d 516, 523 (4th Cir. 2003), *cert denied*, 540 U.S. 822 (2003); *see also havePower, LLC v. Gen. Elec. Co.*, 256 F. Supp. 2d 402, 406 (D. Md. 2003) (citing 10A Charles A. Wright & Arthur R. Miller, *Federal Practice & Procedure* § 2720 (3d ed. 1983)).

## ANALYSIS

### I.    Amlin's Entitlement to the Settlement Funds Based upon the Special Accommodation Amendments

In its Motion for Partial Summary Judgment, Amlin argues that the Special Accommodation Amendments entitle Amlin to repayment of the advances made pursuant to those agreements and that those agreements place Amlin as the first in line for repayment after legitimate medical claims are paid.  In opposition, CREW, PCB, and MBA argue that the language of the Special Accommodation Amendments limited Amlin's right to recover if

the Trusts' insurance was terminated and that, in such a scenario, Amlin could only recover to the extent that the individual trust's assets exceeded all of the trust's other liabilities.

The Defendants' position relies upon the following provision from the Special Accommodation Amendments:

> In the event of termination or non-renewal of this insurance, the Assured [the trust] shall continue to repay Underwriters from the positive net fund balance of the Trust if any, the remainder of any outstanding installments due under this Amendment. Otherwise, this obligation shall be considered part of the terminal liability of the Plan and shall be subject to the terms of such termination or non-renewal as set forth in the Certificates of Insurance.

PCB SAA, ECF No. 1-11; CREW SAA, ECF No. 1-12.  The precise dispute in this case centers on the phrase "*positive net fund balance of the Trust*."

This dispute necessarily raises an issue of contract interpretation.  As explained by the Fourth Circuit, issues of contract interpretation require a two-step inquiry:

> The first step for a court asked to grant summary judgment based on a contract's interpretation is . . . to determine whether, as a matter of law, the contract is ambiguous or unambiguous on its face.  If a court properly determines that the contract is unambiguous on the dispositive issue, it may then properly interpret the contract as a matter of law and grant summary judgment because no interpretive facts are in genuine issue. Even where a court, however, determines as a matter of law that the contract is ambiguous, it may yet examine evidence extrinsic to the contract that is included in the summary judgment materials, and, if the evidence is, as a matter of law, dispositive of the interpretative issue, grant summary judgment on that basis.  If, however, resort to extrinsic evidence in the summary judgment materials leaves genuine issues of fact respecting the contract's proper interpretation, summary

judgment must of course be refused and interpretation left to
the trier of fact.

*Goodman v. Resolution Trust. Corp.*, 7 F.3d 1123, 1126 (4th Cir. 1993) (quoting *World-Wide Rights*

*Ltd. Partnership v. Combe Inc.*, 955 F.2d 242, 245 (4th Cir. 1992).[11]

The phrase "*positive net fund balance of the Trust*" is undefined in the Special

Accommodation Amendments and in the original Certificates of Insurance.  Nevertheless,

both parties suggest that the contract language is unambiguous, but their readings of the

contact result in very different conclusions.  Amlin suggests that the "fund" referenced in

the Special Accommodation Amendment refers to the "Terminal Fund," a defined term in

the original Certificates of Insurance.  Specifically, "Terminal Fund" is defined as the

"current assets on hand to fund the actuarial value of all incurred but unpaid claims . . . ."

CREW Certificate of Insurance at 6, ECF No. 1-5; PCB Certificate of Insurance at 6, ECF

No. 1-10.  Meanwhile, the term "Incurred Claims" refers to "those properly covered

Program costs for medical treatment, diagnosis or advice provided during the Period of

Insurance."  CREW Certificate of Insurance at 5; PCB Certificate of Insurance at 5.  Reading

these terms together, Amlin argues that the Terminal Fund thus only refers to assets on hand

to pay medical claims.  Amlin then argues that the term "Terminal Fund" as used in the

---

[11] Of course, in diversity cases such as this one, the Court must apply substantive state law.  The Court's
citation to *Goodman* reflects the parties' framing of the applicable legal principles in this case, which appear to
be undisputed.  *See* Pl.'s Reply at 7, ECF No. 129.  Nevertheless, the parties have never expressly identified
which state's law governs.

In a diversity action such as this, this Court must apply the choice of law rules of Maryland, the state
where it sits. *See Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941).
The applicable legal principles in this case are widely accepted general principles, and the parties have not
identified any potential conflicts of law; accordingly, a choice of law analysis is unnecessary and this Court will
apply Maryland law.  *See Lowry's Reports, Inc. v. Legg Mason, Inc.*, 271 F. Supp. 2d 737, 750 (D. Md. 2003)
(finding that law of Maryland governed case because "[c]hoice-of-law analysis becomes necessary . . . only if
the relevant laws of the different states lead to different outcomes).  Moreover, the Court notes that *Goodman*
and *World-Wide Rights* decisions both reviewed cases originally decided by this Court, and both appear to
apply Maryland law.

Certificates of Insurance is the equivalent of the term "fund" in the Special Accommodation Amendments because those amendments were not separate agreements and because the Certificates of Insurance use the term "Fund" elsewhere in those documents to refer to the Terminal Fund.[12]

Meanwhile, Defendants CREW, PCB, and MBA rely upon the fact that the term "positive net fund balance of the Trust" is undefined in any of the governing documents. Moreover, they emphasize that the phrase "of the Trust" suggests the term is intended to extend beyond just the Terminal Fund and that the lack of capitalization of the word "fund" distinguishes its use from the defined term in the Certificates of Insurance.

After considering the parties' various arguments presented at the hearing on this point and examining the relevant language in the Special Accommodation Amendments and the Certificates of Insurance, this Court finds that the term "positive net fund balance of the Trust" is ambiguous.  The context of the term as it is used in the Special Accommodation Amendments does not provide any clues as to the proper limitations, if any, of the definition of the term.  The Certificates of Insurance only use the word "fund" within the context of the "Terminal Fund," which supports Amlin's interpretation of the contract language. However, the "f" is capitalized in the Certificates of Insurance (i.e, in those instances

---

[12] Specifically, Amlin points to the termination provision of the Certificates of Insurance, which states that:

> In the event of termination or non-renewal of the Program, Underwriters agree to provide coverage for any Claims Incurred during the Period of Insurance which exceed the Terminal Fund. The Assured shall establish and maintain a Terminal Fund within the Trust in accordance with the terms agreed by both parties. In the event the **Fund** at any time falls below the agreed level of the Terminal Fund required, then the contribution shall be increased . . . to correct such deficit . . . .

CREW Certificate of Insurance at 10; PCB Certificate of Insurance at 10 (emphasis added).

referring to the Terminal Fund) while it is not in the Special Accommodation Amendments. Additionally, the Special Accommodation Amendments do not reference "Claims Incurred" (i.e., the term which effectively limits the Terminal Fund to only medical claims) but instead define the "fund" in reference to the whole trust ("positive net fund balance *of the Trust*").

As the contract language is ambiguous, this Court must then consider any extrinsic evidence bearing on the parties' intent and meaning of the disputed terms. As noted during the hearing, the parties point to differing portions of the factual record in this case to support their interpretation of the contract. Resolution of these disputed matters will require fact-finding and credibility determinations by the Court at the Bench Trial scheduled in January of 2016. Accordingly, this Court finds that determining the meaning of "positive net fund balance of the Trust" cannot be made in the context of cross-motions for summary judgment. The resolution of this determinative interpretation issue precludes both Amlin's Motion for Partial Summary Judgment (ECF No. 92) and MBA's Motion for Summary Judgment (ECF No. 105); accordingly, those motions will be denied.

## II.      The Liability of R.J. Wilson & Associates, Ltd.

Defendant R.J. Wilson & Associates, Ltd. ("RJW") moves for summary judgment, arguing that it does not and never has held any of the disputed settlement funds, and that it has no claim or interest in the funds. Amlin opposes RJW's motion and suggests—in a footnote—that RJW could potentially be liable under Maryland's "alter ego" doctrine. The elements of the alter ego doctrine are: "(1) Complete domination, not only of the finances, but of policy and business practice in respect to the transaction so that the corporate entity

as to this transaction had at the time no separate mind, will or existence of its own," (2) that "such control [was] used by the defendant to commit fraud or wrong, to perpetrate the violation of the statutory or other positive legal duty, or dishonest and unjust act in contravention of the plaintiff's legal rights" and (3) that such "control and breach of duty proximately caused injury or unjust loss." *Serio v. Baystate Properties, LLC*, 209 Md. App. 545, 563 (Md. App. Ct. 2013).

This Court finds that Amlin has presented no basis for finding RJW so liable because Amlin has offered no evidence for any of the required elements of the alter ego doctrine. Moreover, Amlin's requested relief applies to the Defendant Trusts, not RJW. Specifically, Amlin's Complaint includes three counts: an injunction barring Defendants from disbursing the settlement funds without Amlin or the Court's approval,[13] a declaratory judgment that Amlin has an interest in the settlement funds; and an accounting of the receipt and any disbursement of the settlement funds. Thus, it is clear that Amlin's requested recover pertains to the trusts which received settlement funds and, perhaps, those entities currently holding those funds. As the undisputed evidence demonstrates that RJW does not fall into either of these categories, RJW's Motion for Summary Judgment (ECF No. 108) will be granted.

<u>CONCLUSION</u>

---

[13] Amlin's Complaint also suggests that it is seeking reimbursement for "payments made during Syndicate 2001's coverage period for claims in the prior insurer's coverage period." Pl.'s Compl. ¶ 31. Amlin has provided no theory or evidence to support a finding of liability against RJW on this matter, and thus RJW's motion must be granted on this theory as well.

For the reasons stated above, Plaintiff Amlin Corporate Member, Ltd.'s Motion for Partial Summary Judgment (ECF No. 92) and Defendant Medical Benefits Administrators' Motion for Summary Judgment (ECF No. 105) are DENIED.  However, R.J. Wilson & Associates' Motion for Summary Judgment (ECF No. 108) is GRANTED, and Judgment shall be entered in its favor.

A separate Order follows.

Dated:          August 4, 2015                                    /s/_____

                                                                  Richard D. Bennett
                                                                  United States District Judge

15